UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

SECURITIES AND EXCHANGE COMMISSION,

                          Plaintiff,

v.

TIBOR KLEIN AND
MICHAEL R. SHECHTMAN,

                          Defendants.
_____/

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges as follows:

### I. INTRODUCTION

1. This case involves insider trading by the Defendants in the securities of King Pharmaceuticals, Inc. before an October 2010 tender offer announcement.

2. In mid-August 2010, Defendant Tibor Klein, an investment adviser firm owner, learned nonpublic, material information regarding Pfizer Inc.'s planned acquisition of King from Klein's client, attorney Robert M. Schulman. Schulman had learned of the impending merger a few days earlier through his work as an attorney representing King. Klein misappropriated the information from Schulman and purchased King securities for himself and more than 40 of his clients on the basis of that information. Klein made profits of $8,824 for himself and generated $319,550 in profits for his advisory clients.

3. Klein also tipped his best friend, Defendant Michael R. Shechtman, a stock broker, to the nonpublic King merger information. Almost immediately after learning the information, Shechtman traded in King securities for himself and his wife. Shechtman and his wife made profits of $109,040.53.

1

4.      By engaging in the conduct described in this Complaint, each of the Defendants violated and, unless restrained and enjoined by the Court, are reasonably likely to continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5], Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)], and Exchange Act Rule 14e-3 [17 C.F.R. § 240.14e-3].

## II.     DEFENDANTS

5.      Klein, age 39, resides in Melville, New York. He is the owner and president of Klein Financial Services, an investment adviser incorporated in New York and located in Valley Stream, New York.

6.      Shechtman, age 39, resides in Lake Worth, Florida. At all relevant times, Shechtman was a registered representative with broker-dealer Ameriprise Financial, Inc. Shechtman resigned voluntarily from his association with Ameriprise in March 2012.

## III.    RELEVANT ENTITIES

7.      King was a Tennessee pharmaceutical company. Before Pfizer acquired it, King's securities traded on the New York Stock Exchange. In March 2011, Pfizer completed its acquisition of King, which is now a wholly owned subsidiary of Pfizer.

8.      Pfizer, incorporated in Delaware with its principal place of business in New York, New York, is an international biopharmaceutical company. Pfizer's securities currently trade on the New York Stock Exchange and did during the events alleged in this Complaint.

## IV.    JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and (e), 78u-1 and 78aa]. The Defendants have directly or indirectly made use of the means or instrumentalities of

interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

10.     This Court has personal jurisdiction over the Defendants, and venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(c)(3) and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because at least one of the Defendants is found, inhabits, and/or transacts business in the Southern District of Florida and/or because one or more acts or transactions constituting the violation occurred in the Southern District of Florida. Shechtman lives in the Southern District of Florida. On August 16, 2010, Klein made six calls to Shechtman, including one call between two and three minutes long, in this district. That same day, Shechtman submitted an options trading account application, an account he used to place orders for King options, from this district. Shechtman admitted Klein gave him the idea to trade in King, and Klein admitted his input was at least a factor in Shechtman's decision to purchase King securities. On August 18, 2010, Klein called Shechtman 11 times in this district, and that day, Shechtman purchased 300 call options and 4,900 shares of King stock for himself and his wife from this district. On August 19, 2010, Klein called Shechtman eight times in this district, including four calls ranging from three to nine minutes, and Shechtman bought 300 call options from this district. Klein continued to call Shechtman in this district over the next two months. On October 12, 2010, Pfizer and King announced the tender offer before the markets opened. That day, Klein called Shechtman in this district 14 times between 8:30 a.m. and 9:45 a.m., and they spoke at least three times for a total of 18 minutes. Shechtman liquidated his call options that same day from this district. Five of Klein's clients for whom he bought King stock reside in this district.

## V. FACTUAL ALLEGATIONS

### A. Pfizer's Acquisition of King and Schulman's Knowledge

11. On July 9, 2010, King and Pfizer entered into a confidentiality agreement to discuss Pfizer's possible acquisition of King. The companies conducted preliminary due diligence in early August, at which time a law firm colleague also working with King told Schulman about the potential merger. Schulman was not involved in the merger negotiations between the companies, but he was informed about the prospective deal because it had the potential to affect litigation in which Schulman represented King.

12. The companies conducted follow-up due diligence beginning August 12, 2010. Over the month of September, the companies engaged in further negotiations, and King's board approved negotiation of a definitive agreement on September 24, 2010. On September 29, 2010, Pfizer delivered a draft merger agreement to King. On October 11, 2010, King's Board approved a final tender offer from Pfizer to acquire King for $14.25 per share, in cash. That day, King's stock closed at $10.15 per share, with 2,044,260 shares traded.

13. At 8:00 a.m. on October 12, 2010, King and Pfizer issued a joint press release announcing Pfizer's acquisition of King. King stock rose 39% to close at $14.14 per share, and trading volume increased more than 12,000% from the day before, with 256 million shares traded.

14. Pfizer formally acquired King on March 1, 2011, and the same day, King terminated registration of its common stock with the Commission.

### B.  Klein and Schulman Shared a Relationship of Trust and Confidence

15. Schulman and Klein enjoyed a close professional and personal relationship. Schulman entrusted Klein to manage his investment accounts on a discretionary basis for more than a decade before 2010, and he deferred all trading decisions and account management to Klein.

16. Beginning in 2002, Klein made a practice of visiting Schulman and Schulman's wife at least three to four times a year at their home. He stayed overnight, shared meals with them, and reviewed their investment account and financial situation. Klein and Schulman also met for dinner and occasional sporting events when Schulman visited New York on business. Klein and his wife also socialized with Schulman and his wife. For example, Klein attended the wedding of Schulman's only daughter in the summer of 2012.

17. Klein discussed a wide range of topics with the Schulmans, including private financial and personal information. For example, the Schulmans revealed to Klein confidential family matters. Schulman also talked to Klein generally about his client work. Klein knew King was one of Schulman's clients, and Klein knew the names of other clients for whom Schulman worked.

18. Both Schulman and Klein understood they were barred from passing on and trading on non-public information.

### C.  In the Context of Their Relationship of Trust and Confidence, Schulman Disclosed to Klein Material, Nonpublic Information about the King Acquisition

19. Klein's practice since 2002 was to visit Schulman and his wife at their home three to four times a year to review their portfolio, stay overnight as their guest, and socialize with them. Over the weekend of August 13-15, 2010, Klein visited the Washington, D.C. area for

client meetings. He saved the Schulman visit for last, arriving at their house later in the day. He took a walk for about an hour with Mrs. Schulman during which they discussed family and politics. Afterwards, Klein had drinks and dinner with Mr. and Mrs. Schulman. They continued to discuss family, news, and politics. Klein remained overnight as a guest at the Schulman home. The next morning, Klein reviewed their portfolio with Mr. and Mrs. Schulman over breakfast. He also discussed their personal life with them. Klein then left the Schulman home.

20. During a meal with Klein at their home that weekend, Schulman drank several glasses of wine and became intoxicated. He blurted out to Klein, "It would be nice to be King for a day."

21. Schulman intended to imply he was a "big shot" who knew "some kind of information" about King Pharmaceuticals.

D. **Klein Misappropriated the Inside Information and Placed Trades in King**

22. On August 16, 2010, the first day the markets opened following Schulman's disclosure of information about King, Klein purchased 800 King shares for himself and 59,800 King shares for 46 of his clients through an average price account at Klein's firm, Klein Financial Services. This included 3,000 shares Klein allocated to Schulman's account.

23. From August 18 to August 24, Klein purchased 950 more King shares for himself. From August 18 to September 15, Klein purchased 3,600 additional King shares for his clients. In total, during a two-month period, Klein purchased 65,150 King shares for himself and 46 of his clients, at a total cost of $585,216.66.

24. In the year 2010, Klein had not purchased so many securities of an individual security for so many clients in such a short time period as he did when he purchased King securities. Second to the King purchase, Klein's next most significant purchase involved buying

35,150 shares of a fund's securities for 43 accounts, for about $574,772, also in August 2010. In this second most significant purchase, Klein nonetheless bought only about half of the number of shares of King stock, and for fewer clients. In his third most significant purchase, Klein bought 23,000 shares of a company's securities for 16 accounts, for about $113,735, from April through May of 2010. In this third most significant purchase, Klein nonetheless bought only about a third of the number of shares of King stock, and for far only about a third of the number of clients. In the next most significant purchase, Klein bought 10,000 shares of a fund that contained multiple securities for 44 accounts for about $632,400 in November 2010.

E. **Klein Tipped Shechtman, Who Placed Trades in King**

25. Klein called his best friend Shechtman to tell him about the information he had learned about King. Klein and Shechtman attended high school together, worked at numerous jobs together over the years, and served in each other's weddings. They spoke often, but rarely more than once a day. They routinely discussed private personal and professional information. Shechtman admitted Klein had given him the idea to trade in King, and he also acknowledged he understood the legal prohibitions against trading on material nonpublic information.

26. Klein called Shechtman six times on August 16. That same day, Shechtman submitted an application to open an options trading account at Ameriprise. Shechtman handwrote at the top of the form, "Please expedite ASAP." Shechtman had never before traded in options for himself or his wife.

27. On August 18, Klein called Shechtman eleven times. That day, Shechtman purchased 2,500 shares of King stock and 300 call options in his personal account.

28. A call option is a right to buy 100 shares of a particular stock at a predetermined price before a present deadline, in exchange for a premium. For buyers who think a stock will go up, call options permit a profit from a smaller investment than it would take to buy a stock.

29. Also on August 18, Shechtman purchased 2,400 King shares in his wife's Roth IRA account. Shechtman exercised complete trading authority over that IRA account.

30. To purchase the 2,400 King shares in Jodie Shechtman's IRA account, Shechtman sold two mutual funds he held in another account and then transferred the money from the sales of those funds to Jodie Shechtman's IRA account. Prior to the King stock trades, Jodie Shechtman's Roth IRA held stock in one equity security valued at approximately $500 and approximately $3,700 in cash. After the purchase of the 2,400 King shares, King stock made up approximately 98% of Jodie Shechtman's IRA account.

31. On August 19, 2010, Klein called Shechtman eight times in this district, including four calls ranging from three to nine minutes. The same day, Shechtman purchased another 300 call options.

32. On August 23, Klein called Shechtman twice. That same day, Shechtman purchased 75 more call options. About half of all the options expired worthless on September 18, while another half remained open until October 16.

F.  **The Merger Announcement**

33. On October 12, 2010, the day Pfizer announced its acquisition of King, Klein sold all the King securities he had purchased for himself and for his clients. He realized $8,824 in ill-gotten gains from his trading for himself. He realized $319,550 in ill-gotten gains from his trading for 46 of his clients, including $15,500 for Schulman.

34. Klein called Shechtman at least 14 times between 8:30 a.m. and 9:45 a.m., and

they spoke at least three times for a total of 18 minutes.

35. Shechtman liquidated his October call options the day of the announcement, and on October 15, he sold his and his wife's King stock. He realized $109,040.53 in ill-gotten gains from his trading.

## VI. CLAIMS FOR RELIEF

### COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
(Against Both Defendants)

36. The Commission repeats and realleges paragraphs 1 through 35 of this Complaint as if fully restated herein.

37. At all relevant times, Klein knew or should have known the information concerning the possible acquisition of King was material, confidential, and non-public. In breach of the duty of trust and confidence he owed to Schulman, and while in possession of this information, he purchased shares of King stock and disclosed the information to Shechtman, whom he knew, or was reckless in not knowing, would purchase King securities on the basis of that information.

38. At all relevant times, Shechtman knew, or was reckless in not knowing, the information he possessed concerning the possible acquisition of King that Klein had conveyed to him was improperly obtained, non-public information. While in possession of this material, non-public information, Shechtman purchased King stock.

39. By their conduct described above, the Defendants, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails, directly or indirectly, (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to

make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud or deceit upon other persons. By reason of the foregoing, the Defendants violated and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## COUNT II

### Violation of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder
(Against Both Defendants)

40. The Commission repeats and realleges paragraphs 1 through 35 of this Complaint as if fully restated herein.

41. By at least August 15, 2010, substantial steps had been taken to commence a tender offer for the securities of King by Pfizer, which was publicly announced on October 12, 2010.

42. Prior to the public announcement of the tender offer for King, and after a substantial step or steps to commence such tender offer had been taken, Defendants Klein and Shechtman, while in possession of material information relating to such tender offer, which information they either knew or had reason to know was nonpublic and had been acquired directly or indirectly from the offering company, the issuer, or any officer, director, partner, employee, or any other person acting on behalf of the offering company or issuer, purchased or sold or caused to be purchased or sold securities of King.

43. By reason of the foregoing, the Defendants violated and, unless enjoined, are reasonably likely to continue to violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)], and Exchange Rule 14e-3 [17 C.F.R. § 240.14e-3] thereunder.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court:

### I.

### Permanent Injunction

Permanently restrain and enjoin the Defendants and their agents, servants, employees, representatives, attorneys-in-fact, and assigns and those persons in active concert or participation with them, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5], Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)], and Exchange Act Rule 14e-3 [17 C.F.R. § 240.14e-3].

### II.

### Disgorgement

Order each Defendant who purchased and sold King securities on the basis of material, nonpublic information to disgorge his trading profits from each illegal trade, including prejudgment interest thereon.

### III.

### Disgorgement

Order each Defendant to disgorge all profits, including prejudgment interest thereon, realized by (i) the persons to whom Defendant unlawfully communicated material, nonpublic information, (ii) the persons who traded while in possession of material, nonpublic information learned as a result of that Defendant's unlawful communication of material, nonpublic information, and (iii) the persons for whom Defendant traded while in possession of material, nonpublic information.

IV.

Penalties

Order each of the Defendants to pay a civil money penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1].

V.

Further Relief

Grant such other relief as this Court may deem just and appropriate.

VI.

Retention of Jurisdiction

Further, the Commission respectfully requests the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

September 19, 2013

Respectfully submitted,

By: *Robert K. Levenson*
Robert K. Levenson
Regional Trial Counsel
Florida Bar No. 0089771
Direct Dial: (305) 982-6341
E-mail: levensonr@sec.gov
Attorney for Plaintiff
**U.S. Securities and Exchange Commission**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154